CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED Danville
SEP 19 2013
JULIA C. DUDLEY, CLERK
BY
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| DAVID R. HYDE, | CASE NO. 4:12CV00040 |
| Plaintiff, | |
| v. | REPORT AND RECOMMENDATION |
| CAROLYN W. COLVIN,[1] Acting Commissioner of Social Security, | |
| Defendant. | By: B. Waugh Crigler U. S. Magistrate Judge |

This challenge to a final decision of the Commissioner which denied plaintiff's March 11, 2009 protectively-filed applications for a period of disability and disability insurance benefits under the Social Security Act ("Act"), as amended, 42 U.S.C. §§ 416, 423, and 1381, et seq., is before this court under authority of 28 U.S.C. § 636(b)(1)(B) to render to the presiding District Judge a report setting forth appropriate findings, conclusions, and recommendations for the disposition of the case. The question presented is whether the Commissioner's final decision is supported by substantial evidence. 42 U.S.C. § 405(g). For the reasons that follow, the undersigned will RECOMMEND that an Order enter GRANTING the plaintiff's motion for summary judgment, DENYING the Commissioner's motion for summary judgment, ENTERING judgment for the plaintiff, and RECOMMITTING this case to the Commissioner for the sole purpose of calculating and paying proper benefits.

In a decision dated August 27, 2010, an Administrative Law Judge ("Law Judge") found that plaintiff had not engaged in substantial gainful activity since December 13, 2008, his alleged

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin hereby is substituted for Michael J. Astrue as the defendant in this action.

date of disability onset.[2] (R. 16.) The Law Judge determined plaintiff's spine disorder, psoriatic arthritis/Reiter's syndrome, discogenic/degenerative back disease, angina pectoris with ischemic heart disease, essential hypertension, affective disorder, and anxiety disorder were severe impairments. (R. 16.) He also concluded that, through the date of the hearing, plaintiff did not suffer an impairment or combination of impairments which met or equaled a listed impairment. (R. 17.) Further, the Law Judge found that plaintiff possessed the residual functional capacity ("RFC") to perform the full range of light work except that he could only occasionally stoop, kneel, crouch, crawl, or climb ramps, stairs, ladders, ropes and scaffolds, and was limited to low stress, uncomplicated work activities.[3] (R. 18.)

The Law Judge relied on portions of the testimony of Dr. Gerald Wells, a vocational expert ("VE"), which was in response to questions premised on the Law Judge's RFC finding. (R. 22-23, 51-54.) Based on this testimony, the Law Judge determined that plaintiff was unable to perform his past relevant work as a tire builder, but could perform other jobs existing in the national economy such as a washer/driver, service station attendant, or cafeteria attendant. (R. 22-23, 51-54.) The Law Judge found plaintiff not disabled under the Act.

Plaintiff appealed the Law Judge's August 27, 2010 decision to the Appeals Council and submitted additional evidence. (R. 1-13.) In its July 19, 2012 decision, the Appeals Council considered the additional evidence and found no basis to review the Law Judge's decision. (R. 1-2.) The Appeals Council denied review and adopted the Law Judge's decision as the final

---

[2] Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A).

[3] Light work is defined in 20 C.F.R. § 404.1567(b) as involving lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. A job in this category requires a good deal of walking or standing, or when it involves sitting most of the time, some pushing and pulling of arm or leg controls.

decision of the Commissioner. *Id.* This action ensued, cross motions for summary judgment were filed together with supporting briefs, and oral argument was held by telephone before the undersigned on July 29, 2013.

The Commissioner is charged with evaluating the medical evidence and assessing symptoms, signs, and medical findings to determine the functional capacity of the claimant. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990); *Shively v. Heckler*, 739 F.2d 987 (4th Cir. 1984). The regulations grant some latitude to the Commissioner in resolving conflicts or inconsistencies in the evidence, which the court is to review for clear error or lack of substantial evidentiary support. *Craig v. Chater*, 76 F.3d 585, 589-590 (4th Cir. 1996). In all, if the Commissioner's resolution of the conflicts in the evidence is supported by substantial evidence, the court is to affirm the Commissioner's final decision. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence is defined as evidence, "which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than preponderance." *Id.* at 642.

When a claimant submits additional evidence on administrative appeal, and where the Appeals Council considers the evidence but denies review, courts must consider the record as a whole, including the new evidence, in determining whether the final decision is supported by substantial evidence or whether there is good cause to remand for further proceedings. *Meyers v. Astrue*, 662 F.3d 700, 707 (4th Cir. 2011); *Wilkins v. Secretary*, 953 F.2d 93, 96 (4th Cir. 1991). Because the Council made no findings regarding the evidence submitted on administrative appeal, the court must consider whether the evidence offered there was both new, as opposed to cumulative, and material, in that it reasonably may have changed the decision by the fact finder had it been before him/her in the first instance, and whether it relates to the period for which

3

benefits were denied. *Borders v. Heckler*, 777 F.2d 954 (4th Cir. 1985). If the evidence demonstrates only a worsening of the claimant's condition after the period covered by the Commissioner's final decision, plaintiff's remedy would be to file a new claim. *Sizemore v. Secretary of Health and Human Servs.*, 865 F.2d 709 (6th Cir. 1988).

Plaintiff seeks reversal or remand on the grounds that the Law Judge improperly discounted the opinion of his treating medical providers, and that the Law Judge did not pose an appropriate hypothetical to the vocational examiner (VE). Therefore, plaintiff argues that the Law Judge's findings are not supported by substantial evidence.

Plaintiff's alleged onset date is December 13, 2008, when he began to have increased pain due to an accident at work. Plaintiff suffered preexisting severe back pain prior to this date, and in fact his treating neurosurgeon, Carlos Bagley, M.D., had recommended that he undergo surgery in March of 2008. (R. 404.) Plaintiff, who had undergone a lumbar laminectomy in 1994, opted to postpone surgery until his planned retirement in June of 2009. (R. 250.) In December 2008, however, he was hit by a truck full of tires, leaving him with left foot weakness and a significant increase in his lower back pain. (R. 396.) On December 17, 2008, plaintiff was seen by Dr. Bagley, who noted that plaintiff suffered impaired dorsiflexion in his left foot and a positive straight leg test, as a result of which he requested that plaintiff obtain an MRI. (*Id.*)

On December 31, 2008, plaintiff returned to Dr. Bagley at which time the results of his MRI were available. Dr. Bagley opined that plaintiff suffered lumbosacral radiculopathy and L4-5 grade I spondylolisthesis. (R. 391.) He recommended again that plaintiff undergo surgery, to which plaintiff agreed. (R. 392.) On January 6, 2009, due to his heart problems, plaintiff underwent a stress test in order to be cleared for surgery. (R. 305.) On January 20, 2009, Dr. Bagley performed a L4-5 transforaminal lumbar interbody fusion using a PEEK interbody graft

and Synthes Pangea instrumentation system. (R. 388.) The operation reportedly was uneventful, and plaintiff was discharged from the hospital on January 22, 2009. (R. 384.)

On January 30, 2009, plaintiff followed up with his primary care physician to have his sutures removed. Francis Wong, MD, of Piedmont PrimeCare noted that plaintiff's surgical wound was healing well, but that it appeared the wound likely would reopen if the sutures were removed at that time. (R. 361.) On February 3, 2009, plaintiff returned to Piedmont Primecare where his sutures were removed. (R. 356.)

On February 4, 2009, plaintiff received counseling from Patricia Grigoryev, Ph.D., who had been treating plaintiff since 2005. (R. 442.) Dr. Grigoryev diagnosed plaintiff as suffering a depressive disorder not otherwise specified ("NOS"), bipolar disorder, and borderline personality disorder. She assessed plaintiff's current GAF to be 58.[4] On March 4, 2009, plaintiff returned to Dr. Bagley for a follow-up visit, who reported that plaintiff continued to have back discomfort, but that it was "not nearly as bad as it was preoperatively." (R. 381.) Dr. Bagley noted that plaintiff's hardware appeared to be stable, and there was no evidence of instrumentation failure. (*Id.*)

On March 9, 2009, plaintiff was seen by Dr. Renuka N. Prasad, a psychiatrist who had been treating plaintiff for many years and who had diagnosed him with bipolar disorder. (R. 428.) Dr. Prasad observed that plaintiff was having manic symptoms with pressured speech, impulsivity, and irritability and recommended that plaintiff increase his dose of Lamictal. (R.

---

[4] The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning "on a hypothetical continuum of mental health-illness." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 1994) (DSM–IV). A GAF of 51 to 60 indicates the individual has "[m]oderate symptoms...or moderate difficulty in social, occupational, or school functioning....", while a GAF of 41 to 50 indicates the individual has "serious symptoms...or any serious impairment in social, occupational, or school functioning." DSM–IV at 32.

420.) On March 17, 2009, Dr. Grigoryev assessed plaintiff's GAF at 55, noting that he was irritable and angry. (R. 441.)

On March 18, 2009, plaintiff was treated by David Caldwell, M.D., who had been plaintiff's rheumatologist since 1989. Dr. Caldwell noted that, due to his surgery, plaintiff had been off his arthritis medication since December, and that he was "experiencing generalized increase in articular pain despite very limited activity." (R. 242.) Dr. Caldwell opined that plaintiff was in obvious discomfort due to his back and articular disease (arthritis), and observed that he had a limited cervical range of motion with a marked limited range of motion in his back, and tenderness in his right elbow, shoulders, right hip, left hip, low back, and bilateral knees. (R. 242-243.) Dr. Caldwell recommended that plaintiff restart his arthritis medications. (R. 243.)

On April 28 and May 6, 2009, Dr. Grigoryev assessed plaintiff with a GAF of 58. (R. 439-440.) On June 2, 2009, Dr. Grigoryev did not assess a GAF, but noted that plaintiff seemed hypomanic and had been having trouble due to pain and his lack of sleep at night. (R. 508.) On June 3, 2009, plaintiff followed up with Dr. Bagley. (R. 465.) Plaintiff reported that he was doing better than before the surgery, but he continued to have aches and pains. (*Id.*) Dr. Bagley opined that plaintiff's recovery was progressing appropriately. (R. 466.) On June 8, 2009, plaintiff saw Dr. Prasad who increased his medication and observed that plaintiff had a clear history of bipolar disorder and was more depressed than usual. (R. 469.) On June 9, 2009, plaintiff began counseling with Galen Diehl, LPC, as Dr. Grigoryev was moving. Mr. Diehl assessed plaintiff's GAF was from 48-55. (R. 495.) On June 16, 2009, Mr. Diehl assessed plaintiff's GAF at 45-55. (R. 494.)

On July 7, 2009, Dr. Prasad increased plaintiff's Lamictal dose. (R. 469.) Plaintiff continued to see Mr. Diehl for counseling. On July 9, Mr. Diehl assessed plaintiff's GAF at 45-

55. (R. 493.) On July 22, Mr. Diehl estimated his GAF was 47-55, and on July 29, 2009, he assessed plaintiff's GAF at 50-60. (R. 491-492.) On August 5, 2009, plaintiff followed up with Dr. Caldwell. Dr. Caldwell observed that plaintiff experienced mild limitation in his cervical range of motion and restricted lumbar mobility. (R. 526.) Plaintiff reported increasing stiffness and discomfort, so Dr. Caldwell increased his Humira from every other week to every week. (R. 528.) On August 5, 11, and 25, 2009, plaintiff received counseling from Mr. Diehl, who assessed plaintiff's GAF at 48-58 each time. (R. 488-490.) On August 31, 2009, Dr. Prasad diagnosed plaintiff with bipolar disorder currently mildly depressed and parent-child problems. (R. 543.) Dr. Prasad prescribed Seroquel to plaintiff on top of his other two psychiatric medications. (*Id.*) On September 1 and 18, 2009, Mr. Diehl assessed plaintiff's GAF at 45-55. (R. 487, 562.)

On September 2, 2009, Dr. Bagley observed that plaintiff continued to progress appropriately. (R. 565.) Plaintiff reported an increase in generalized joint pain, but Bagley believed that this likely was due to his arthritis. (R. 564.) Dr. Bagley recommended aquatic therapy so that plaintiff could increase his activity level without added stress to his joints. (R. 565.) On September 15, 2009, Mr. Diehl wrote a letter noting that plaintiff had been diagnosed with bipolar disorder and opining that, given his mental and medical problems, plaintiff was unable to keep and secure employment. (R. 485.) On September 22, 2209, Mr. Diehl assessed plaintiff's GAF at 50-60. (R. 561.)

On September 28, 2009, Dr. Prasad opined that plaintiff's mood was fairly stable although he was mildly hypomanic. (R. 543.) Dr. Prasad continued plaintiff's current medications. (*Id.*) On September 30, October 30, November 4, November 10, November 17, December 1, and December 8, 2009, plaintiff received counseling from Mr. Diehl, who

7

estimated plaintiff's GAF scores at 55-63, 55-65, 50, 50, 55-60, 55-60, and 50-55. (R. 554-561.) On December 18, 2009, plaintiff complained to Dr. Prasad of some hypnogogic or hypnopompic hallucinations. (R. 542.) He also reported that he had been experiencing back pain and had gained a considerable amount of weight. (*Id.*) Due to weight gain, Dr. Prasad discontinued plaintiff's Seroquel and instead increased his Lamictal prescription. (*Id.*) On December 22, 2009, December 29, 2009, and January 12, 2010, Mr. Diehl assessed plaintiff with GAF scores ranging from 50 to 59. (R. 551-553.) On January 19, 2010, Dr. Prasad observed that plaintiff was mildly hypomanic. (R. 542.) Because of elevated liver enzymes, plaintiff was prescribed Lithium. (*Id.*) Mr. Diehl estimated plaintiff's GAF at 45-55 on February 10, 2010, and at 47-57 on February 17 and March 2, 2010. (R. 548-550.) On March 5, 2010, plaintiff reported that he had not been sleeping well. (R. 542.) Dr. Prasad increased plaintiff's Lithium dose. (*Id.*) On March 17, 2010, Mr. Diehl counseled client and estimated his GAF to be 50-60 with an improvement to 53-63 on March 23, 2010. (R. 546-547.) On March 19, 2010, plaintiff was examined by Dr. Caldwell, who observed that plaintiff had marked limitation to range of motion in his back, synovial thickening in his hand, and pain in his ankles. (R. 573.)

On May 21, 2010, Dr. Caldwell wrote a letter opining that plaintiff was unable to work either full or part time. (R. 579.) He noted that plaintiff's musculoskeletal impairments caused by Reiter's syndrome and spondylosis caused significant pain for plaintiff. Dr. Caldwell opined that plaintiff's acute symptoms had been helped by treatment, but that his pain still persisted. (*Id.*) He further opined that plaintiff was unable to stand, walk, or sit for extended periods and that "repetitive function would likely provoke peripheral synovitis relating to his Reiter's disease." (R. 579.) Dr. Caldwell observed that plaintiff's treatment plan also required periods of rest.

8

On June 7, 2010, Mr. Diehl wrote a letter reporting that plaintiff had been diagnosed with bipolar disorder. Mr. Diehl observed that plaintiff struggled to maintain effective daily functioning and opined that "if [plaintiff] re-enters employment, one can expect [his] mental health condition to markedly regress and worsen." (R. 580.) In Mr. Diehl's opinion, plaintiff's mental condition markedly impaired plaintiff's ability to maintain regular employment. (*Id.*) Mr. Diehl attached a functional capacity assessment which revealed that plaintiff suffered extreme limitations in his ability to maintain regular work attendance, tolerate ordinary work stress, accept instructions and respond appropriately to criticism from supervisors. (R. 582.) Plaintiff's ability to maintain attention and concentration, maintain customary work pace and complete tasks, and respond appropriately to changes were considered marked. (R. 581-582.)

Following the Law Judge's decision, plaintiff submitted additional evidence in the form of a residual functional capacity assessment completed by Dr. Caldwell. Dr. Caldwell's assessment indicates that the assessment was based on his treatment of plaintiff, whom he had last seen on July 14, 2010, prior to the Law Judge's decision. (R. 583.) Dr. Caldwell's assessment limited plaintiff to sitting for forty-five minutes and standing for fifteen minutes at a time, and to no more than four hours of sitting, standing, and walking total each day. (R. 584-585.) Dr. Caldwell opined that plaintiff's condition frequently would interfere with his concentration and that he would need unpredictable unscheduled breaks which could result in missing days of work at a time. (R. 584-585.) Dr. Caldwell limited plaintiff to lifting ten pounds or less occasionally, twenty pounds rarely, and never fifty pounds. He further opined that plaintiff never could stoop, bend, or squat, and could only rarely twist, crouch, or climb. (R. 586.) Plaintiff also suffered significant limitations on repetitive reaching, handling, or fingering.

(*Id.*) Dr. Caldwell concluded that plaintiff would miss four or more days each month due to flare ups of his constant pain. (R. 587.)

Plaintiff takes issue with the Law Judge's assignment of little weight to the opinion of his treating physician, Dr. Caldwell. The Law Judge found that Dr. Caldwell's opinion was entitled to little weight because his statement that plaintiff is unable to work goes to an issue reserved to the Commissioner. (R. 19.) The Law Judge also found that Dr. Caldwell did not appropriately quantify his restrictions and that his opinion was not supported by plaintiff's medical record and daily activities. (R. 19-20.) While the Law Judge is correct that the ultimate question of whether a plaintiff is disabled is an issue reserved to the Commissioner, the fact that Dr. Caldwell offered such an opinion does not in itself undermine the credibility of his medical opinion. Dr. Caldwell has been plaintiff's treating physician since 1989 and is a specialist in rheumatology, both factors which the Law Judge must consider in determining the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c). Although the Law Judge found that Dr. Caldwell was not specific enough in his limitations, he does not explain how Dr. Caldwell's absolute admonition against repetitive function is unclear. (R. 579.) Furthermore, Dr. Caldwell's functional capacity assessment very clearly quantified each of plaintiff's limitations. (R. 583-588.) While this assessment was not before the Law Judge, it was before the Appeals Council and therefore must be considered in determining whether the final decision is supported by substantial evidence. The assessment meets the new and material evidence standard and, as it is based solely on Dr. Caldwell's treatment of plaintiff prior to the Law Judge's decision, it most certainly relates back to the relevant period. It is difficult for the undersigned to imagine how much more credible and specific Dr. Caldwell's assessment could be. Finding that it was entitled to little weight is not supported by substantial evidence.

The Law Judge also concluded that Dr. Caldwell's opinion is not supported by the medical record. The Law Judge found that plaintiff's pain was controlled with medication. (R. 20.) The Law Judge missed the point, however, that plaintiff's pain was controlled only by a combination of medication and limited activity. (R. 579.) Additionally, according to Dr. Caldwell, treatment controlled only plaintiff's acute symptoms, and plaintiff continued to experience chronic, disabling pain. (R. 579.) What is more, there is no valid medical evidence in this record contradicting the reports and assessments of plaintiff's treating sources. Even the State agency review physicians did not find that plaintiff was capable of performing light work. (R. 166, 202.) Instead, they predicted that plaintiff would improve and thus would be able to perform light work before he met the durational requirement.[5] (*Id.*) That simply did not happen. The uncontroverted medical evidence demonstrates that, contrary to the predictions, plaintiff failed to improve enough to perform light work within the relevant period. Thus, the Law Judge appears simply to have substituted his lay opinion for that of the overwhelming medical evidence.

Plaintiff next argues that the Law Judge improperly discredited the evidence of Mr. Diehl, his counselor, regarding his mental limitations. Unlike Dr. Caldwell, Mr. Diehl is not an acceptable medical source under the regulations. 20 C.F.R. § 404.1513. Although his assessment itself cannot provide a basis to determine whether plaintiff suffers a medically determinable impairment, it must be considered, even if discounted for justifiable reasons, in determining severity once an impairment has been established. Dr. Prasad, who is an acceptable medical source, diagnosed plaintiff as suffering bipolar disorder, and therefore the Law Judge was not at liberty to simply reject Mr. Diehl's assessment of the severity of plaintiff's impairment.

---

[5] The undersigned notes that the state agency physicians opined that plaintiff did not meet the twelve-month durational requirement because he would be capable of light work by January 20, 2010, thirteen months after plaintiff's alleged onset date. (R. 166.)

The Law Judge discounted Mr. Diehl's assessment on the basis that plaintiff continued to work with the same symptoms until December 2008. He noted that plaintiff's GAF scores indicated no more than moderate limitations, and that plaintiff engaged in activity outside the home. Furthermore, Mr. Diehl's opinion is contradicted by that of Dr. Prasad, who reported that plaintiff's mood was fairly stable. (R. 542.) The limitations found by the Law Judge accounted for Mr. Diehl's primary recommendation that plaintiff be restricted to a less stressful work environment. Because Mr. Diehl's assessment appears to be contradicted in some respects by that of Dr. Prasad, the Law Judge's decision to accord Mr. Diehl's evidence little weight is supported by substantial evidence.

Plaintiff next alleges that the Law Judge failed to pose appropriate hypothetical questions to the vocational examiner (VE). At the hearing, the Law Judge first asked the VE to consider the physical and mental restrictions set forth in Exhibit 12E, without specifying on the record exactly what those limitations were. (R. 52.) In response, the VE interpreted the assessment to be for light work without significant mental and emotional limitations. (*Id.*) Therefore, the undersigned cannot determine whether the VE considered all the mental limitations which eventually were set forth in the Law Judge's decision.

The Law Judge next asked the VE whether jobs would be available if all of plaintiff's allegations were credible, and then whether plaintiff would be disabled if the Law Judge accepted Dr. Caldwell's assessment that plaintiff "would not be able to complete a eight hour work day, forty hour a week job."[6] (R. 54-55.) The VE responded that no jobs would be available. (*Id.*) The Law Judge did not include in his question to the VE any of the other limitations set forth by Dr. Caldwell, such as the inability to perform repetitive tasks. Thus, it is

---

[6] Despite the Law Judge's ultimate finding that Dr. Caldwell was not specific enough in his opinion, he seemed to have little trouble interpreting this limitation at the hearing.

12

clear on this record that the Law Judge failed to pose hypothetical questions encompassing all of the restrictions set forth by the substantial evidence. Furthermore, although the Law Judge's RFC finding indicates postural limitations, there is no indication from the hearing record that the VE was asked to take these limitations into account. Accordingly, the undersigned finds that the Commissioner did not discharge her burden at the final level of the sequential evaluation.

Finally, plaintiff argues that a subsequent award of disability benefits, commencing the day following the Law Judge's decision, is reason, in and of itself, to remand the case. The Commissioner has argued that the Fourth Circuit already has decided this issue in her favor. *Baker v. Comm'r of Soc. Sec.*, No. 12-1709, 2013 WL 1866936 (4th Cir. May 6, 2013). However, *Baker* is distinguishable, if for no other reason than that it does not involve a subsequent award of benefits dated only one day following a prior denial. In addition, the decision is unpublished and carries no precedential value. Beyond that, the undersigned shares the view of the Honorable James C. Dever, III, Chief Judge of the Eastern District of North Carolina, that the Commissioner's interpretation of *Baker* places it in conflict with the Fourth Circuit's published decision in *Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337 (4th Cir. 2012).[7] *See Woodall v. Colvin*, No. 5:12-cv-357, 2013 WL 4068142 *6 (E.D.N.C. Aug. 12, 2013) (citing *Bird*). In *Bird*, the Fourth Circuit held that another agency's determination is relevant evidence. *Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337 (4th Cir. 2012). Even more, an agency's own determination should be relevant evidence when it relates to the period in question and falls so close on the heels of an earlier claim.[8] Since there are other substantive reasons to reverse, the

---

[7] Judge Dever adopted a Memorandum and Recommendation of a Magistrate Judge which found the Commissioner's position at odds with Fourth Circuit precedent.

[8] In fact, the Law Judge in this case relies on the assessments made in the agency's unfavorable decisions at the initial and reconsideration levels.

undersigned will not adopt this rationale as a reason to reverse, but acknowledges and declines to accept the Commissioner's position on this issue.

For all these reasons, it is RECOMMENDED that an Order enter GRANTING the plaintiff's motion for summary judgment, DENYING the Commissioner's motion for summary judgment, ENTERING judgment for the plaintiff, and RECOMMITTING this case to the Commissioner for the sole purpose of calculating and paying proper benefits.

The Clerk is directed to immediately transmit the record in this case to the presiding United States District Judge. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note objections, if any they may have, to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(l)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection. The Clerk is directed to transmit a certified copy of this Report and Recommendation to all counsel of record.

ENTERED: _____
U.S. Magistrate Judge

9-19-2013
Date